IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

UNITED BEHAVIORAL HEALTH, a California corporation and its
subsidiary PACIFICARE BEHAVIORAL HEALTH, INC.,
*Plaintiffs/Appellants*,

*v.*

MARICOPA INTEGRATED HEALTH SYSTEM, an Arizona special taxing
district, *Defendant/Appellee*.

No. 1 CA-CV 14-0027
1 CA-CV 14-0421
(Consolidated)
FILED 6-23-2015

Appeal from the Superior Court in Maricopa County
No. CV2013-003331
The Honorable Michael J. Herrod, Judge

**AFFIRMED IN PART; REVERSED IN PART; VACATED AND
REMANDED IN PART**

COUNSEL

Brownstein Hyatt Farber Schreck LLP, Phoenix
By John C. West, Robert M. Kort and Chase A. Bales
*Counsel for Plaintiffs/Appellants*

Clark Hill PLC, Scottsdale
By Russell A. Kolsrud and Mark S. Sifferman
*Counsel for Defendant/Appellee*

---

## OPINION

Presiding Judge Andrew W. Gould delivered the opinion of the Court, in which Judge Maurice Portley and Judge Jon W. Thompson joined.

---

**G O U L D**, Judge:

¶1        This appeal presents the question of whether two health care providers, Aurora Behavioral Healthcare ("Aurora") and Maricopa Integrated Health System ("MIHS") (collectively the "Providers"), may compel arbitration of coverage claims arising under Medicare and ERISA health care plans. The Providers seek to compel arbitration pursuant to an arbitration clause in their agreement with United Behavioral Health ("UBH"), the entity which administers the subject Medicare and ERISA benefit plans. The arbitration clause is expressly governed by the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. § 1, *et seq.*[1]

¶2        UBH cannot be compelled to arbitrate the Providers' Medicare coverage claims. We conclude that Congress intended Medicare's administrative procedure to provide the exclusive remedy for resolving Medicare coverage claims, and that this procedure overrides the FAA's presumption favoring arbitration.

¶3        However, because the record is not clear as to whether Aurora has standing to assert its ERISA coverage claims, we do not address the arbitrability of Aurora's ERISA claims. We therefore vacate the trial court's order compelling arbitration of Aurora's ERISA claims, and remand for further proceedings consistent with this opinion.

### FACTS AND PROCEDURAL HISTORY

¶4        UBH administers various types of health insurance plans, including Medicare and ERISA benefit plans. Aurora and MIHS are facilities that provide mental-health and substance-abuse treatment. The Providers each entered into a Facility Participation Agreement ("Facility Agreement") with UBH allowing them to participate in UBH networks that provide mental-health and substance-abuse health care services. The

---

[1]        Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

Facility Agreement contains an arbitration clause that states the parties will "resolve any disputes about their business relationship," and if they are unable to do so, the dispute will be submitted to binding arbitration.

¶5             In these consolidated cases, members of Medicare and ERISA plans administered by UBH received acute inpatient psychiatric care from the Providers. MIHS provided care to members with Medicare benefit plans; Aurora provided care to members with either Medicare or ERISA benefit plans.

¶6             The Providers obtained pre-authorization from UBH for an initial term of acute inpatient care for each member. When the Providers sought authorization to extend care beyond the initially authorized period, UBH denied coverage.

¶7             In its denial letters UBH stated that (1) coverage for services was determined by the terms of each member's benefit plan, and (2) in each instance acute inpatient care was not covered because it was not medically necessary. Despite receiving UBH's letters denying coverage, the Providers elected to continue providing acute inpatient care.

¶8             In order to obtain reimbursement for their services, the Providers sought to arbitrate the disputed claims, but UBH refused. As a result, the Providers filed actions in superior court to enforce the arbitration clause in the Facility Agreement. In response, UBH filed motions to stay arbitration on the grounds the claims were not arbitrable.

¶9             In MIHS' case, the trial court denied UBH's motion to stay arbitration, concluding that MIHS' claims were subject to the arbitration clause in the Facility Agreement. In Aurora's case, the trial court granted UBH's motion to stay arbitration, stating that Aurora's claims were "coverage disputes," and therefore "must be decided by the terms of the various Benefit Plans and pursuant to the exclusive Medicare grievance procedures that apply to those claims."

¶10             Both decisions were appealed separately; however, because these appeals present identical factual and legal issues, we have consolidated them on appeal.

## DISCUSSION

I.      The FAA and the Arbitration Clause

¶11      The Providers contend that the language of the arbitration clause in the Facility Agreement is extremely broad, requiring the parties to arbitrate any disputes about their business relationship.  As a result, the Providers argue UBH is contractually bound to submit their claims to binding arbitration.

¶12      The Facility Agreement provides that the question of arbitrability is governed by the FAA.   Under the FAA, "[d]eterminations of arbitrability, like the interpretation of any contractual provision, are subject to de novo review."  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999); *see AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (stating that arbitrability is, as a matter of contract, a question of law for a court to decide).

¶13      The FAA "embodies a strong federal policy in favor of arbitration."  *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 173 (3d Cir. 2014) (quoting *Sweet Dreams Unltd., Inc. v. Dial-A-Mattress Int'l. Ltd.*, 1 F.3d 639, 641 (7th Cir. 1993)).  "Congress, however, may override the [FAA's] presumption favoring arbitration agreements by a contrary provision in another statute.  The burden of demonstrating such congressional intent rests with the party opposing arbitration."  *Bird v. Shearson Lehman/Am. Express, Inc.*, 926 F.2d 116, 119 (2d Cir. 1991) (citing *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987)).  Congress' intent "'will be deducible from [the statute's] text or legislative history,' or from an inherent conflict between arbitration and the statute's underlying purposes."  *McMahon*, 482 U.S. at 227.

¶14      In this case, the language of the arbitration clause is extremely broad; it reaches beyond the Facility Agreement to encompass all aspects of the parties' business relationship.  *See Lakeland Anesthesia, Inc. v. United Healthcare of La., Inc.*, 871 So. 2d 380, 392 (La. Ct. App. 2004) (stating that an arbitration provision that covers "any disputes about their business relationship" is not limited in scope to the agreement itself); *Aztec Med. Servs., Inc. v. Burger*, 792 So. 2d 617, 623-24 (Fla. Dist. Ct. App. 2001) (same).

¶15      Based on the broad language of the arbitration clause and the FAA's presumption favoring arbitration, we conclude the Providers may compel arbitration unless there is a contrary provision in Medicare or ERISA expressing Congress' intent that these claims are nonarbitrable.

II.    Medicare Statutory Scheme

¶16        In determining whether arbitration of the Providers' claims conflicts with the Medicare Act, we must examine the text and legislative history of the Act.  *See McMahon*, 482 U.S. at 227.

¶17        "Medicare is a federal health insurance program benefitting individuals who are over 65, or have a disability, or are suffering from end-stage renal disease."  *Estate of Ethridge v. Recovery Mgmt. Sys., Inc.*, 235 Ariz. 30, 33, ¶ 7 (App. 2014); *see* 42 U.S.C. § 1395c.  The Medicare program is administered by the Centers for Medicare and Medicaid Services ("CMS"), a division of the Department of Health and Human Services ("HHS").  42 U.S.C. §§ 1395hh, -1395kk; *Estate of Ethridge*, 235 Ariz. at 33, ¶ 7.  Medicare provides two options for hospital and medical benefits: (1) Medicare Parts A and B, or traditional Medicare, and (2) Medicare Part C, known as Medicare Advantage.  42 U.S.C. § 1395w-21; *Estate of Ethridge*, 235 Ariz. at 34, ¶ 10.

    A.    Medicare Part C

¶18        Here, UBH administered Medicare Part C plans.  Medicare Part C provides Medicare beneficiaries with the option of contracting with a private insurance company to obtain Medicare benefits.  42 U.S.C. §§ 1395w-21, 1395w-27; *Estate of Ethridge*, 235 Ariz. at 34, ¶ 10.  Under Medicare Part C, CMS contracts with private insurers, or Medicare Advantage Organizations ("MAOs"), to provide medical benefits for Medicare beneficiaries; in return, the MAOs receive a fixed monthly capitation payment for each Medicare beneficiary enrolled in their benefit plan.  42 U.S.C. §§ 1395w-21, --23(a), --1395w-27, --1395w-28; *Estate of Ethridge*, 235 Ariz. at 35, ¶ 16.  MAOs then contract with health care providers to furnish medical services.  42 U.S.C. § 1395w-23(a)(1)(A); *RenCare, Ltd. v. Humana Health Plan of Tex., Inc.*, 395 F.3d 555, 557-59 (5th Cir. 2004); 42 C.F.R. § 422.2.  Under an MAO's contract with CMS, a capitation fee is paid regardless of the value of services provided to the beneficiary, and the MAO assumes full financial risk for providing Medicare benefits to the beneficiary.  42 U.S.C. § 1395w-25(b); *RenCare*, 395 F.3d at 557-59.

¶19        Despite the differences in traditional Medicare and Medicare Part C, the benefits under both options are Medicare benefits.  42 U.S.C § 1395w-21(a).  Medicare Part C is a "federal program operated under [f]ederal rules," and thus, while Part C participants may elect to "opt out" of traditional Medicare, they do not opt out of Medicare.  H. R. Rep. No.

108-391, at 557 (2003); *see Estate of Ethridge*, 235 Ariz. at 33, ¶ 10. The Medicare Trust fund subsidizes the benefits for both Part C and traditional Medicare. 42 U.S.C. § 1395w-23(f); 42 C.F.R. § 422.322; *see RenCare*, 395 F.3d at 558-59 (discussing traditional Medicare payments). Thus, Part C does not offer beneficiaries private insurance or private insurance policies; the MAOs are government contractors furnishing Medicare benefits. *See, e.g., United States v. Lopez-Diaz*, 940 F. Supp. 2d 39, 47 (D.P.R. 2013) (stating that Medicare Part C benefits are not furnished by "'privately owned insurance companies, which pay from private funds and not from Medicare funds'"; rather, a Part C plan "is a type of Medicare health plan offered by a private company that contracts with Medicare to provide beneficiaries with Medicare benefits."); *Pagarigan v. Superior Court*, 126 Cal. Rptr. 2d 124, 134 (Cal. App. 2d Dist. 2002) (stating that the relationship between Medicare Part C enrollees and a MAO is "not between an insurer and its policyholder, but rather, between Medicare. . . and Medicare beneficiaries through the intermediary of Medicare health care service plans contracted with the federal government to provide Medicare benefits.").

          B.       Congressional Regulation of Medicare Part C Coverage

¶20       Congress and the Secretary of HHS[2] have promulgated numerous statutes and regulations concerning standards for Medicare Part C coverage.[3] *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1150 (9th Cir. 2010); *Mass. Ass'n of Health Maint. Orgs. v. Ruthardt*, 194 F.3d 176, 180 (1st Cir. 1999); *Ardary v. AETNA Health Plans of Cal., Inc.*, 98 F.3d 496, 498 (9th Cir. 1996). For example, MAOs furnishing benefits to Part C participants must provide the same coverage and benefits as those provided to Medicare Part A and B participants. 42 U.S.C. § 1395w-22(a)(1)(B); 42 U.S.C. § 1395mm(c)(2)(A); 42 C.F.R. § 417.440(b)(1). MAOs must also provide medically necessary treatment, comply with CMS manuals and directives regarding benefit coverage, and ensure access to emergency and skilled

---

[2]     Pursuant to 42 U.S.C. § 1395ff(a), the "determination whether an individual is entitled to benefits . . . is entrusted to the Secretary [of HHS] in accordance with regulations prescribed by him or her." *McCall v. PacifiCare of Cal., Inc.*, 21 P.3d 1189, 1193 (Cal. 2001).

[3]     This broad statutory and regulatory scheme for Medicare Part C includes a provision stating that any state law or regulation that conflicts with the "standards established under [Part C]" is preempted. 42 U.S.C. § 1395w-26(b)(3); *see Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1149-50 & n.23, (9th Cir. 2010); *Potts v. Rawlings Co., LLC*, 897 F. Supp. 2d 185, 195 & n.4 (S.D.N.Y. 2012); *Estate of Ethridge*, 235 Ariz. at 35, ¶¶ 16-18.

nursing services. 42 U.S.C. § 1395y(a)(1)(A) (medically necessary treatment); 42 U.S.C. § 1395w-22(d)(1) (access to emergency and skilled nursing services); 42 C.F.R. §§ 422.101(a), (b)(1)-(3), (c) (manuals and directives regarding benefit coverage).

¶21 As part of the extensive Medicare statutory and regulatory scheme, Congress has adopted the Social Security appeals process to resolve all coverage disputes involving Part C participants. 42 U.S.C. § 1395w-22(g)(5); 42 U.S.C. §§ 405(g), (h) (Social Security administrative appeals process); *see* 42 U.S.C. § 1395ii (making appeals process in §§ 405(g), (h) applicable to Medicare Parts A and B); *Heckler v. Ringer*, 466 U.S. 602, 604-06 (1984) (stating that Medicare has adopted the Social Security administrative appeals process). As a result, the Secretary of HHS has created a detailed administrative review procedure for appeals involving Medicare Part C coverage disputes. 42 C.F.R. §§ 422.560-.626.

¶22 Under Medicare's administrative review procedure, "[j]udicial review of a claim for benefits is available only after the Secretary [of HHS] has rendered a 'final decision' on the claim," and a "final decision by the Secretary on a claim 'arising under' Medicare may be reviewed by no person, agency or tribunal except in an action brought in federal district court, and then only after exhausting administrative remedies." *McCall*, 21 P.3d at 1193-94 (quoting *Heckler*, 466 U.S. at 605). A claim "arises under" Medicare, and is therefore subject to the mandatory administrative review process, when the claim is "inextricably intertwined" with a claim for coverage under Medicare. *Heckler*, 466 U.S. at 614, 624; *see Blue Cross & Blue Shield of Ala.*, 90 So. 3d 158, 164 (Ala. 2012); *see also RenCare*, 395 F.3d at 557 (stating that a claim arises under Medicare if "the claim is 'inextricably intertwined' with a claim for Medicare Benefits").

¶23 Medicare's administrative appeals procedure is the sole avenue for resolving coverage disputes. *Heckler*, 466 U.S. at 614-15 (stating that "the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act" is 42 U.S.C. § 405(g)). And the sole avenue of judicial review from such administrative procedures is in federal court. 42 U.S.C. §405(g); 42 U.S.C. § 1395w-22(g)(5). As a result, federal courts lack jurisdiction to review coverage claims until the Medicare review process has been exhausted. *Uhm*, 620 F.3d at 1138, 1144; *Giesse v. The Sec'y of the Dep't of Health and Human Servs.*, 476 F. Supp. 2d 734, 739-40, 742 (N.D. Ohio 2006); *McCall*, 21 P.3d at 1193-94. At no point is the Secretary's final decision reviewable by a state court. *See* 42 U.S.C. § 405(g); 42 U.S.C. § 1395w-22(g)(5).

¶24        We conclude that based on the extensive administrative appeals process outlined in the Medicare Act, Congress has expressed an intent to subject all Medicare coverage claims to this administrative process. Thus, Medicare coverage claims are nonarbitrable claims.

C.        Coverage Claims vs. Payment Disputes

¶25        The Providers assert, however, that their claims are not coverage claims subject to the Medicare administrative appeals process. Rather, the Providers argue that their claims are payment disputes that do not involve Medicare or the Medicare administrative process. Specifically, the Providers allege that UBH determined the members' services were covered, but then failed to pay the Providers the full amount owed for the services pursuant to the rates set out in the Facility Agreement.

¶26        Medicare coverage claims involve a beneficiary's right to receive coverage for medical treatment, supplies or services. *Blue Cross & Blue Shield of Ala.*, 90 So. 3d at 331. In a coverage claim, the harm, or injury, is based on the allegation that benefits were improperly denied; as a result, the remedy is reimbursement of benefits. *Uhm*, 620 F.3d at 1143-44; *see Heckler*, 466 U.S. at 618 (coverage claim involved denial of coverage for certain surgical procedures); *Giesse*, 476 F. Supp. 2d at 740, 743 (coverage claim involved denial of benefits for post-hospital skilled nursing facility). As a result, proof of a coverage claim necessarily involves reference to and interpretation of a Medicare benefit plan, as well as Medicare coverage standards. *Blue Cross & Blue Shield of Ala.*, 90 So. 3d at 164; *cf. Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 331 (2d Cir. 2011).

¶27        In contrast, claims that are "wholly collateral" to a claim for coverage do not arise under the Medicare Act, and are not subject to Medicare's administrative procedure. *Heckler*, 466 U.S. at 618; *see Uhm*, 620 F.3d at 1145; *Ardary*, 98 F.3d at 499, 501; *McCall*, 21 P.3d at 1194-95, 1197-98. The harm involved in a wholly collateral claim is not the denial of coverage, and therefore the remedy sought is not payment of benefits. *Uhm*, 620 F.3d at 1145; *see Ardary*, 98 F.3d at 500 (wrongful death claim for compensatory and punitive damages based on provider's failure to transfer or airlift decedent to intensive cardiac care facility not subject to Medicare administrative review process); *McCall*, 21 P.3d at 1200 (plaintiff's claims for emotional distress, medical negligence and fraud, seeking tort damages for injuries suffered due to MAO and provider's delays in providing referrals to specialists, were wholly collateral to Medicare and not subject to Medicare administrative appeals process). Moreover, a wholly collateral claim is not focused on interpreting a Medicare benefit plan or Medicare

coverage standards, but rather the elements of the specific cause(s) of action. *Uhm*, 620 F.3d at 1145 (in establishing a wholly collateral claim, a plaintiff "may be able to prove elements of [his tort] causes of action without regard to any of the provisions of the [Medicare] Act relating to the provision of benefits"); *McCall*, 21 P.3d at 1200 (because the plaintiffs "may be able to prove the elements of some or all of their causes of action without regard, or only incidentally, to Medicare coverage determinations," the court held that "none of their causes of action seeks, at bottom, payment or reimbursement of a Medicare claim or falls within the Medicare administrative review process").

¶28        One type of claim that is wholly collateral to a coverage claim is a "payment claim." In a payment claim, there is no dispute that the benefits are covered by Medicare; the issue is the amount the MAO should pay the provider for the covered benefit. *See RenCare*, 395 F.3d at 558 (holding that services for which payment was sought by provider had been approved by the MAO and, therefore, the dispute was a payment dispute, not a coverage dispute subject to Medicare appeals process); *Lakeland*, 871 So. 2d at 382-83 (payment dispute concerning delay in payment for covered services was  not subject to Medicare appeals process); *Christus Health Gulf Coast v. AETNA, Inc.*, 237 S.W.3d 338, 340, 344 (Tex. 2007) (payment dispute between MAO and provider as to liability of MAO for covered services due to insolvency by MAO's subsidiary was not subject to Medicare appeals process); *cf. Montefiore*, 642 F.3d at 331 (discussing the distinction between coverage disputes and payment disputes under ERISA); *Canandaigua Emergency Squad, Inc. v. Rochester Area Health Maint. Org., Inc.*, 780 F. Supp. 2d 313, 320-22 (W.D.N.Y. 2011) (payment dispute under ERISA based on fee schedules and offsets for payment of covered ambulance services).

¶29        In payment disputes, since coverage is not disputed, resolution of the claim does not require construction of the Medicare benefit plan or Medicare coverage standards, but rather is focused on an independent contract or obligation between the MAO and the provider that specifies the amount of payment. *RenCare*, 395 F.3d at 559 ("At bottom, [the provider's] claims are claims for payment pursuant to a contract between private parties."); *Christus*, 237 S.W.3d at 344 (the parties' "dispute concerns not whether the services were covered under Medicare, but rather who should bear the loss associated with [the MAO subsidiary's] failure to pay").

### D. The Providers' Claims Are Coverage Claims

**¶30** In determining whether a claim is inextricably intertwined with a claim for coverage, thereby making it a coverage claim, a party's characterization or framing of its claim is not dispositive. Rather, a court must determine if the claim is, "at bottom," a claim for coverage. *Heckler*, 466 U.S. at 614. A party cannot evade the Medicare administrative process by creatively and "cleverly conceal[ing]" a coverage claim as arising under some source other than Medicare. *Uhm*, 620 F.3d at 1141-42; *see Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 286 (5th Cir. 1999) (finding that claims, despite being presented as constitutional claims, were inextricably intertwined with a claim of entitlement to Medicare benefits and subject to the Medicare administrative appeals procedure).

**¶31** Here, the Providers seek to avoid the mandatory Medicare administrative procedure by casting their claims as payment disputes that do not arise under Medicare. The trial court in the MIHS case agreed, concluding the treatments were pre-authorized, and therefore determined to be covered services by UBH.

**¶32** The trial court's determination in the MIHS case is not supported by the record. UBH authorized coverage for an initial period of treatment. However, when MIHS sought approval of continued acute inpatient care, UBH denied the request on the grounds acute inpatient care was no longer medically necessary. UBH notified MIHS of its denial of coverage prior to the dates of service. Accordingly, the services for which the Providers seek payment were not pre-authorized or determined by UBH to be covered services. *Bennett v. Baxter Grp., Inc.*, 223 Ariz. 414, 419, ¶ 16 (App. 2010) (stating that the appellate court will not defer to the trial court's factual findings if they are clearly erroneous).

**¶33** Moreover, despite the Providers' efforts to recast their claims as payment claims, the record shows that they are coverage claims. At bottom, the Providers are challenging UBH's denial of coverage for continued acute inpatient care on the grounds the treatment was not medically necessary. This is a coverage claim. *Blue Cross & Blue Shield of Ala.*, 90 So. 3d at 167; *see Lone Star OB/GYN Assoc. v. AETNAHealth Inc.*, 579 F.3d 525, 531 (5th Cir. 2009) (holding that a coverage claim involves a "determination of benefits under the terms of a plan – i.e., what is 'medically necessary' or a 'Covered Service'"). Additionally, the remedy sought by the Providers is a coverage remedy: reimbursement for what they contend were medically necessary services. *See supra*, ¶ 26.

**¶34**     Finally, the Providers' claims are coverage claims because resolution of their claims necessarily depends on construction of the members' Medicare benefit plans and applicable Medicare standards. *See supra*, ¶ 26. The Facility Agreement does not define what constitutes medically necessary services; rather, the Agreements clearly state that "medically necessary" and "covered services" are defined and controlled by the provisions of the individual members' Medicare benefit plans. The Facility Agreement also states that the parties must comply with "all applicable Medicare laws, regulations and CMS instructions."

E.     Arbitrability of the Providers' Medicare Coverage Claims

**¶35**     We cannot ignore Congress' intention that Medicare's mandatory administrative procedure provides the exclusive remedy for the Providers' Medicare coverage claims. As a result, the Providers' coverage claims are not subject to arbitration under the FAA, and UBH cannot be compelled to arbitrate these claims.[4]

III.     The FAA and Aurora's ERISA Coverage Claims

**¶36**     Aurora's coverage claims involving the members' ERISA benefit plans are subject to ERISA's exclusive legal standards and remedies. *Montefiore*, 642 F.3d at 327-28 (based on ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), an action "to recover benefits due" or to "enforce . . . rights under the terms of the plan" is a coverage claim subject to ERISA's civil remedy provisions). The civil enforcement scheme created by ERISA is "comprehensive"; it "completely preempts any state-law cause of action that 'duplicates, supplements, or supplants' an ERISA remedy."[5] *Montefiore*, 642 F.3d at 327.

**¶37**     Whether Aurora's ERISA coverage claims are arbitrable is less clear. *Compare Bird*, 926 F.2d at 122 (holding that the FAA requires courts to enforce agreements to arbitrate statutory ERISA claims); *with CardioNet*, 751 F.3d at 178 (stating that plan participants and their assignees have the right to pursue ERISA claims in court rather than through mandatory

---

[4]     The issue of the Providers' standing to file a Medicare administrative appeal based on 42 C.F.R. § 422.566(c)(1)(ii) (appeals from an organization determination denying benefits) is not before us in this case.

[5]     Upon remand the trial court may determine that Aurora's state-law claims, if any, are preempted by ERISA; however, we need not reach that issue in this opinion because the matter of standing remains unresolved.

arbitration). However, we need not decide this issue because the record is unclear as to whether the Providers have stated a valid ERISA claim.

¶38 One of the first requirements in alleging an ERISA claim is that "the plaintiff be one entitled to assert a claim under ERISA." *Pentech Infusions, Inc. v. Anthem Health Plans of Ky., Inc.*, 387 F. Supp. 2d 712, 714 (W. D. Ky. 2005). Only a participant or a beneficiary may enforce rights under an ERISA plan. 29 U.S.C. § 1132(a). Aurora is neither a participant nor a beneficiary, and the record is not clear as to whether there has been a valid assignment of the ERISA plan members' claims. Thus, we cannot determine whether Aurora has alleged a valid ERISA claim. Accordingly, we do not reach the issue of whether Aurora's ERISA claims are subject to arbitration under the FAA.

## CONCLUSION

¶39 We hold that the arbitration clause in the parties' Facility Agreement, although broad enough to encompass the dispute at bar, cannot compel the parties to arbitrate their Medicare coverage claims. Congress has enacted a specific procedure for resolving Medicare coverage disputes such that compelling arbitration of these claims under the FAA would be in direct conflict with the Medicare statutes. Therefore, as to the claims involving Medicare coverage, we affirm the trial court's order staying arbitration in UBH v. Aurora, and reverse the order compelling arbitration in UBH v. MIHS.

¶40 However, because the record is unclear as to whether Aurora received a valid assignment of the members' ERISA claims, we vacate the trial court's order compelling arbitration in UBH v. Aurora, and remand for further proceedings consistent with this opinion.



Ruth A. Willingham · Clerk of the Court
FILED: ama